# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

MITZI L.,

        Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Case No. 3:18-5370 TLF

OPINION AND ORDER TO AFFIRM THE COMMISSIONER'S DECISION TO DENY DISABILITY BENEFITS

Plaintiff brought this matter for judicial review of the Commissioner's denial of her application for supplemental security income ("SSI") and disability insurance ("DBI") benefits. Plaintiff contends the decision of the Commissioner was based on legal error and not supported by substantial evidence. For the reasons set forth below, the decision to deny benefits is affirmed.

## FACTUAL AND PROCEDURAL HISTORY

On October 28, 2014, plaintiff filed for SSI and DIB, alleging disability beginning November 1, 2012. Administrative Record ("AR") 20. These claims were denied on initial administrative review and on reconsideration. *Id*. Plaintiff appeared and testified at a hearing before administrative law judge ("ALJ") Ilene Sloan on July 27, 2016. AR 45. Following the hearing, the ALJ issued an unfavorable decision on October 27, 2016. AR 20-37.

The Commissioner employs a five-step sequential disability evaluation process in determining whether a claimant is disabled. 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any step thereof, the disability determination is made at that step, and

OPINION AND ORDER TO AFFIRM THE
COMMISSIONER'S DECISION TO DENY DISABILITY
BENEFITS - 1

the sequential evaluation process ends. *Id.* Step one considers whether the claimant is engaged in "substantial gainful activity." *Kennedy v. Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013) (citing C.F.R. § 416.920(a)(4)). Step two considers "the severity of the claimant's impairments. *Id.* If the claimant is found to have a severe impairment, step three considers "whether the claimant's impairment or combination of impairments meets or equals a listing under 20 C.F.R. pt. 404, subpt. P, app. 1." *Id.* "If so, the claimant is considered disabled and benefits are awarded, ending the inquiry." *Id.* If not, the claimant's residual functional capacity ("RFC") is considered at step four in determining whether the claimant can still do his or her past relevant work and, if necessary, at step five "make an adjustment to other work." *Id.*

At step one, the ALJ determined plaintiff had not engaged in substantial gainful activity since plaintiff's alleged onset date of November 1, 2012. AR 22. At step two, the ALJ found plaintiff has the following severe impairments: status post thyroid/parathyroid surgeries; status post thyroid cancer; status post elbow and hand procedures; obesity; and fibromyalgia. AR 23. At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. AR 26.

Prior to step four, the ALJ determined plaintiff has the RFC to perform light work "except she can only occasionally stoop, kneel, crouch, and crawl. She can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. She would need to avoid concentrated exposure to hazards such as moving machinery and unprotected heights. She can frequently handle and finger with both upper extremities, and can frequently reach in all directions." AR 26-27. After determining plaintiff's RFC, the ALJ found at step four she was unable to perform any of her past relevant work, but that at step five she could perform other

jobs existing in significant numbers in the national economy, and therefore found plaintiff was not disabled. AR 35-36.

Plaintiff requested review and the Social Security Administration Appeals Council denied review on March 12, 2018, making the ALJ's decision the Commissioner's final decision subject to judicial review. AR 1. Plaintiff appealed to this Court on May 9, 2018. *See* Dkt. 4 p. 4. The Parties consented to proceed before a magistrate judge. Dkt. 2.

## DISCUSSION

Plaintiff seeks reversal of the ALJ's decision and remand for an award of benefits, arguing the Commissioner erred in: evaluating (1) plaintiff's severe impairments; (2) plaintiff's symptom testimony; (3) plaintiff's RFC; and (4) whether plaintiff can perform work existing in substantial numbers in the national economy.

The Court will uphold an ALJ's decision unless: (1) the decision is based on legal error; or (2) the decision is not supported by substantial evidence. *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). This requires "'more than a mere scintilla,'" though "'less than a preponderance'" of the evidence. *Id.* (quoting *Desrosiers*, 846 F.2d at 576). The Commissioner's findings will be upheld "if supported by inferences reasonably drawn from the record." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

If more than one rational interpretation can be drawn from the evidence, then the Court must uphold the ALJ's interpretation. *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007). That is, "[w]here there is conflicting evidence sufficient to support either outcome," the Court "must

affirm the decision actually made." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984) (quoting *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)). The Court, however, may not affirm by locating a quantum of supporting evidence and ignoring the non-supporting evidence. *Orn,* 495 F.3d at 630.

**1. Whether the ALJ appropriately evaluated plaintiff's severe impairments.**

Plaintiff contends the ALJ's step-two determination of plaintiff's severe impairments does not account for her severe impairment of "status post mid foot fusion." Dkt. 15 p. 5.

Step-two of the administration's evaluation process requires the ALJ to determine if the claimant "has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citation omitted). An impairment is "not severe" if it does not "significantly limit" the ability to conduct basic work activities. *Id*. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Smolen*, *supra*, 80 F.3d at 1290 (quoting Social Security Ruling "SSR" 85-28) (citing *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988)). The step-two analysis is "a de minimis screening device to dispose of groundless claims" when the disability evaluation process ends at step two. *Smolen*, *supra*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)). Plaintiff bears the burden to establish by a preponderance of the evidence the existence of a severe impairment that prevented performance of substantial gainful activity and that this impairment lasted, or is expected to last, for at least twelve continuous months. *Yuckert, supra*, 482 U.S. at 146.

In this case, medical records show plaintiff fractured her foot in late 2011 and in December 2012, she was diagnosed with posttraumatic arthritis in the left foot and underwent

mid-foot fusion surgery. AR 3914, 3894-3896. In July of 2013, plaintiff reported continuing lateral foot pain. AR 3641. Her physician performed a bone scan and stated he was "a bit at a loss as to why she continues to have her lateral foot pain, other than this is tendon related and related to the biomechanics of her foot." *Id*. In August and November of 2013, plaintiff's surgeon removed the retained hardware from plaintiff's foot. AR 3621 and 3637.

The ALJ noted subsequent reports show few specific complaints related to left foot problems, which supports a finding that plaintiff's foot condition is not severe. *See* AR 25. Plaintiff counters with citations to an April 2014 visit in which she sought treatment for chronic foot pain and a November 2014 assessment of lower extremity muscle spasms and bilateral leg pain. Dkt. 15 p. 6. But the ALJ reasonably discounted plaintiff's April 2014 report of chronic foot pain because it was made in the context of requesting narcotic pain medication. AR 25*; see* AR 3516. As discussed below, doctors have noted plaintiff's consistent pattern of being less than candid with her symptoms to obtain narcotic pain medication. *See* Section 3, *infra*. Furthermore, it is not evident plaintiff's November 2014 muscle spasms and leg pain relate to her left foot condition. *See* AR 1235-1243.

The paucity of complaints related to a foot condition is consistent with plaintiff's testimony at the hearing. Plaintiff made no specific mention of limitations due to foot problems. *See* AR 45-66. Moreover, as the ALJ implied, plaintiff's activities do not suggest limitations from foot pain. *See* AR 34. Plaintiff took care of her terminally ill mother for roughly a year and a half from March 2013 to September 2014. *See* AR 60, 295. Plaintiff's duties included helping her mother with eating, toileting, and dressing. AR 60. She also cared for the family's horses, which she apparently continued to do after her mother passed away. *See* AR 297. These duties generally show ability to work on one's feet.

In sum, while plaintiff underwent a foot procedure in 2012, the paucity of subsequent complaints related to foot pain suggest her condition resolved. Her activities also tend to suggest any continuing foot impairment has "no more than a minimal effect on [her] ability to work." *See Smolen*, *supra*, 80 F.3d at 1290. Therefore, substantial evidence supports the ALJ's determination that plaintiff's left foot condition is not a severe impairment.

### 2. Whether the ALJ appropriately concluded plaintiff did not meet one of the listings.

Plaintiff broadly disputes the ALJ's determination that her impairments did not meet or equal one of the listings. Dkt. 15 p. 4. However, "a bare assertion of an issue does not preserve a claim." *D.A.R.E. America v. Rolling Stone Magazine,* 270 F.3d 793, 793 (9th Cir.2001) (internal citations omitted). Plaintiff fails to identify a legal standard with respect to the listings and does not provide any reasoning how the ALJ erred with respect to the listing analysis. See *id*. pp. 1-12. Therefore, the court concludes the ALJ did not err in finding plaintiff's impairments did not meet or medically equal any of the listings. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (the court will not consider an issue that a plaintiff fails to argue "with any specificity in his briefing").

### 3. Whether the ALJ appropriately evaluated plaintiff's symptom testimony.

Plaintiff contends the ALJ did not provide legally sufficient reasons to discount her symptom testimony. The Court does not agree.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id*.; see also *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Unless

affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." *Lester*, 81 F.3d at 834 (citation omitted).

Here, plaintiff testified that her inability to keep a schedule is the primary issue preventing her from working full time. AR 52. Plaintiff testified that she lost her thyroid and parathyroid glands, which causes problems regulating the levels of potassium and calcium in her body. AR 59. When her calcium levels are too low, plaintiff allegedly experiences paralytic contractions all over her body. When her calcium levels are too high, plaintiff allegedly experiences excruciating pain in her bones. AR 54. She claims that if she is too low on potassium it affects her cardiac and muscle functions. However, plaintiff stated that she is allergic to oral potassium and calcium, so she must go to the hospital "two or three days every week" to get electrolytes through a port in her chest. AR 51-53. Sweating and any exercise allegedly cause her to lose her reserves of calcium and potassium. AR 59.

Plaintiff testified that her other symptoms are constant fatigue and chronic vertigo. AR 55, 64. For example, she alleged "a lot of times" she is too fatigued to walk across the room. AR 62. Plaintiff denied being able to lift or carry "things." AR 63. Plaintiff claimed as of the day of the hearing, she could walk for 100 feet before needing to stop, and only 4 or 5 feet before needing rest if she goes up any kind of incline. AR 62-63. She claimed her medications make her feel "wired," and she only sleeps three or four hours a night, which affects her concentration. AR 55.

Plaintiff also allegedly suffers from kidney stones, heart arrhythmia, and migraines. AR 62. She claimed she cannot type because of nerve damage in her hands, and that it is hard to do anything repetitive with her wrists. AR 65. She also claimed problems in her thumbs and elbows.

OPINION AND ORDER TO AFFIRM THE
COMMISSIONER'S DECISION TO DENY DISABILITY
BENEFITS - 7

However, although she allegedly continues to have a weak grip in her left hand, she noted surgeries to her right elbow and left thumb have "helped a lot as far as functionality." AR 58.

Plaintiff claimed she did intermittent work as an independent massage therapist up until May of 2016. A large dose of radiation treatment she received in March 2016 allegedly exacerbated her heart problems and wrecked her salivary glands, which caused her to stop consistently working, although she acknowledged she continued to "pick up one massage here and there[.]" AR 51-52.

The ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the record. AR 27-28. The ALJ discounted plaintiff's testimony because the record showed drug-seeking behavior, which gave reason to doubt plaintiff's symptoms were as severe as she presented to her physicians; and her activities showed significantly greater functionality than she alleged. AR 28-35.

A. Medical Evidence/Drug Seeking Behavior

The ALJ found it reasonable that plaintiff would have at least some symptoms due to her thyroid and parathyroid conditions. AR 28. The ALJ noted evidence plaintiff would be permanently hypocalcemic (have low calcium) due to a loss of her thyroid glands and hypoparathyroidism. *Id*. The ALJ also recognized that symptoms of hypocalcemia could include muscle pain and cramping and irregular heartbeat with dizziness. *Id*. However, the ALJ found plaintiff's medical evaluations indicated the objective findings and plaintiff's presentation were not consistent with her alleged limitations, and doctors frequently concluded that plaintiff's

reported symptoms were associated with drug seeking activity. See AR 29-33. The ALJ discussed a consistent pattern of drug seeking activity, including the following examples.

In August 2014, plaintiff presented to the emergency room with complaints of leg, arm, and abdominal pain. Treatment notes document that plaintiff demanded "Valium, Benadryl for any medication, and doses of dilaudid and morphine every 20 minutes." AR 3418. Treatment providers noted plaintiff was "manipulative"—she stated she would allow her blood to be drawn only if she received the medication she was demanding. AR 3419. Plaintiff's requests were denied, and she walked out angrily from the emergency room. AR 3419.

In September 2014, plaintiff assured treatment providers she was not driving, and plaintiff was administered narcotic pain medication. AR 3398. However, plaintiff was then seen driving herself away from the hospital. Treatment providers noted plaintiff "clearly misrepresented information in order to obtain sedating/narcotic medicines from UC. This presentation is c/w drug seeking behavior—acute on [sic] chronic." *Id*. The treatment provider further noted "pt's stated symptoms do not correlate clinically with his her physical appearance, physical exam, vital signs, and many prior lab studies. Pt has no visible indicators of pain or distress, is resting comfortably, NAD, VSS. Pt ambulates easily with steady gait." *Id*.

Plaintiff's medical record contains an additional note on "drug-seeking behavior," which states: "patient presents to UC and ERs multiple times despite recent normal lab values. Patient has stated that her plan of care must include port access, Benadryl, IV Phenergan, IV narcotics and IV benzodiazepines. [P]atient becomes irate and belligerent when denied any of these. . . ." AR 1348.

On October 29, 2014, John Campbell M.D. noted Plaintiff had 18 visits in approximately 2 and a half months and he was concerned Plaintiff was doctor shopping. AR 1115. Dr.

Campbell further noted "several times in the past . . . her symptoms only seem to be way out of proportion to the abnormalities in her lab work. I was also concerned that I reviewed her inpatient records and the inpatient physicians were concerned that she is getting secondary gain, and suspecting benzodiazepine abuse and dependence." *Id*. In November 2014, Plaintiff again presented to the emergency room requesting pain medication. AR 1164. According to a nurse, plaintiff was lying calm and motionless when observed from afar but began rocking back and forth the moment the nurse walked into the room. *Id*. According to the nurse, plaintiff left upset that she did not receive any narcotics. *Id*.

In 2016, plaintiff's longtime treatment providers with Franciscan Health noted plaintiff had 56 emergency room visits in the past year, and many more urgent care visits. They concluded her complaints of pain were a component of drug seeking. They indicated that she was manipulative and that, in the future, "[h]ospital admission should be only be considered in the future if there is a "clear indication." AR 2514.

Plaintiff argues the numerous severe impairments the ALJ found at step two of the analysis contradict the little weight the ALJ gave her symptom testimony. But the step two analysis merely establishes whether or not a medically determinable impairment caused more than a minimal effect on a plaintiff's ability to work. *See Smolen*, *supra*, 80 F.3d at 1290. Thus, positive findings at step two do not necessarily require an ALJ to adopt the full extent of limitations a plaintiff alleges are the result of her severe impairments.

Plaintiff next argues the alleged exaggeration of symptoms is not a good reason to disregard her testimony, because Plaintiff's fibromyalgia—allegedly undiagnosed until 2015—explains her frequent claims of pain and discomfort and need for medication. Undiagnosed fibromyalgia, however, does not explain the less than candid behavior noted in plaintiff's

treatment record—for example, the report that Plaintiff was lying calm and motionless when observed from afar but began rocking back and forth the moment the provider walked into the room. AR 1164.

Although on some occasions doctors found Plaintiff was indeed hypocalcemic, e.g. AR 985, her less than candid behavior, the concerns about drug seeking, and the frequency her claims were unsubstantiated are legally sufficient reasons to doubt Plaintiff's symptoms are as disabling as she claims. *See Mohammad v. Colvin*, 595 F. App'x 696, 697 (9th Cir. 2014) ("Evidence of malingering is . . . sufficient to support a negative credibility finding . . . .")

B. Activities

The ALJ found Plaintiff's activities were mostly inconsistent with the disabling symptoms Plaintiff alleged. AR 34-35. Plaintiff's activities, as discussed by the ALJ, included caring for her terminally ill mother, working with horses daily, and doing intermittent work as an independent massage therapist. *Id*. Plaintiff cared for her terminally ill mother 24 hours a day for roughly a year and a half until her mother passed away in September 2014; and her duties included helping her mother with eating, toileting, and dressing. *See* AR 60, 295. She also cared for the family's horses, which she apparently continued to do after her mother passed away. *See* AR 297. The ALJ cited the following examples of Plaintiff's activities. *See* AR 34.

In July of 2013, the Plaintiff indicated she continued to take care of her mother, get around in the barn, and take care of the horses. AR 3641 and 3642. In April 2014, Plaintiff stated that she cares for her mother and looks after the horses, which "she really enjoys and keeps her active." AR 3517. In a 2015 function report, Plaintiff noted that her mother had horses, and that she (the [Plaintiff]) was still feeding the horses daily. AR 297. In September of 2015, Plaintiff

told a treatment provider she was working with horses every day and preparing them for events. AR 1378. That same month, she told a treatment provider she cleans horse stalls daily. AR 2012.

The ALJ found Plaintiff's home care and horse duties consistent with the job of home attendant, which is a job at the medium exertional level. AR 34. Hence, the ALJ determined Plaintiff's ability to do these duties for one and a half years during the relevant period is "markedly inconsistent with her allegations, including her claims of incapacitating pain, dizziness, fatigue, and body shaking." *Id*.

The ALJ also noted evidence showing Plaintiff worked intermittently as a massage therapist during the period at issue.

> For instance, In January 2015, Plaintiff told doctors that she could not wear a Holter monitor because she was working as a massage therapist and could not work while wearing the monitor. In September of 2015, [Plaintiff] told doctors she could not follow their order to reduce physical exertion prior to scheduled blood tests because she worked as a massage therapist. In February 2016, she indicated that she worked as a massage therapist. At the July 2016 hearing, she stated that she last did massages in May 2016.

AR 34 (citing AR 2012, 1392, 2518, 2522).

The ALJ found Plaintiff's work as a massage therapist not consistent with Plaintiff's allegations, including her claims of incapacitating pain, constant vertigo, dizziness, severe fatigue, and body shaking. The ALJ also noted the work of massage therapist is classified as a medium job, AR 35 (citing the VE's testimony at AR 68), and Plaintiff's ability to do this work intermittently suggests that she could do a less demanding light job on a consistent basis. AR 35.

The record supports the ALJ's discussion of Plaintiff's activities, and the Court agrees that her demonstrated ability to work as a massage therapist, provide full daily care to her mother, and provide daily care to large animals – horses -- shows a level of functioning that is inconsistent with her claims of disabling pain, constant vertigo, dizziness, and severe fatigue.

1 Hence, the evidence of plaintiff's activities is a clear and convincing reason to discount her
2 symptom testimony. Therefore, the ALJ did not err in discounting Plaintiff's symptom
3 testimony.

### 4. Whether the ALJ appropriately evaluated Plaintiff's RFC

Plaintiff contends the ALJ's RFC analysis is flawed because it does not account for limitations from her upper extremity conditions, low calcium levels, and fibromyalgia.

A. <u>Upper extremity conditions</u>

With respect to her upper extremity conditions, the ALJ assessed a limitation to frequent handling and fingering with both extremities. AR 27. Plaintiff argues her upper extremity conditions show that a limitation to frequent handling and fingering is inadequate. Dkt. 15 p. 8-9. Plaintiff notes that she has been diagnosed with various disorders of the elbows, fingers, and wrists, and has undergone several surgeries, including a dorsal compartment release in June 2010 and trigger thumb release in February 2013. *Id*. She also notes a June 2016 recommendation that she receive surgery on her right elbow. *Id*.

Plaintiff, however, does not provide any explanation how the conditions she lists require greater limitations than assessed in the RFC. See Dkt. 15 p. 8-9. She suggests the Court should interpret medical evidence differently than the ALJ did. But "[t]he trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

Here, the ALJ reasonably concluded a limitation to frequent fingering and handling is sufficient to address Plaintiff's upper extremity limitations. The ALJ noted Plaintiff underwent various surgeries on her upper extremities from 2010 to 2013, the last of which were left thumb

trigger release in February of 2013 and right elbow surgery in November 2013. AR 32. However, the ALJ found both conditions resolved after surgery. *Id*. The ALJ relied on a report by orthopedist Clarence Fossier, M.D., who performed an independent medical examination on Plaintiff in July of 2014. *See id*. Dr. Fossier reviewed Plaintiff's medical record, and diagnosed medial epicondylitis in the right elbow, bilateral radial styloid tenosynovitis, left carpometacarpal strain, left trigger finger, and right ulnar nerve lesion. AR 889. Nevertheless, Dr. Fossier issued few significant restrictions in Plaintiff's functioning. *See* AR 896. Among his findings, Dr. Fossier reported Plaintiff could use her hands for repetitive tasks including simple grasping, pushing and pulling, and fine manipulating. AR 896. The ALJ gave this opinion significant weight. AR 35.

The ALJ found few subsequent reports showed any complaints or findings indicative of problems with upper extremities until March 2015, when Plaintiff reported that her right elbow and upper extremity symptoms had returned. AR 33. Plaintiff was "adamant" she not receive an injection for tendinitis and asked to be referred for surgery. AR 1370. However, the ALJ found Plaintiff's complaints and findings in March 2015 were not consistent with a rheumatology evaluation from a month prior, in which she displayed active full range of motion at her shoulders, elbows, and wrists, and 5/5 hand grip strength. AR 33 (citing AR 1378-79).

The ALJ also found Plaintiff's symptoms caused little functional restriction because she did not follow up in a timely way with the surgical referral from March 2015, and treatment notes from March 2015 through June 2016 showed few, if any specific complaints or findings indicative of abnormalities in the upper extremities. AR 33.

The ALJ noted Plaintiff did not follow up on the referral to surgery until June 2016, when Ghalib A. Husseini, M.D. indicated they would proceed with a right side "de Quervain's release"

procedure. AR 3051. However, the ALJ noted that Dr. Husseini did not record any examination findings to corroborate Plaintiff's report of her symptoms or to estimate the functional limitation from her reported symptoms. AR 33 (citing AR 3051). Thus, the ALJ determined clinical findings before and after Dr. Husseini's evaluation are the best gauge of Plaintiff's function. AR 33.

As discussed above, the ALJ also reasonably found Plaintiff's activities suggested no greater limitations than those in the RFC and were inconsistent with her allegations. Considering Plaintiff's activities, Dr. Fossier's medical examination, and the medical record showing only sporadic complaints and findings related to an upper extremity condition, the ALJ reasonably concluded Plaintiff was capable of frequent handling and fingering in both extremities. Because the ALJ's conclusion was reasonable, the Court will not substitute its judgment for that of the ALJ. *See Matney,* 981 F.2d at 1019.

B. <u>Low calcium levels and fibromyalgia</u>

Plaintiff argues her symptoms of hypocalcemia—syncope, fatigue, muscle weakness, cramping, abdominal pain, kidney stones, and numbness—were not properly accounted for in the RFC. Dkt. 15 p. 10. She cites an April 2016 note by Hope Torregosa M.D., who stated "hypocalcemia from surgical hypoparathyroidism is very difficult to treat[. P]atients have very poor quality of life and she is essentially a very good example of how it is not to have any parathyroid glands." AR 1611. Plaintiff adds that the limiting nature of her hypocalcemia, in conjunction with her fibromyalgia, limit her ability to lift and carry and concentrate and persist on a continual basis. Dkt. 15 p. 10.

As noted, "[t]he trier of fact and not the reviewing court must resolve conflicts in the evidence, and if evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019.

Here, the ALJ acknowledged diagnoses of fibromyalgia and Dr. Torregosa's note that hypocalcemia can lead to a poor quality of life. AR 24, 28. However, while Dr. Torregosa's note suggests some problems from hypocalcemia, it does not describe what specific functional limitations Plaintiff would suffer due to her condition. *See* AR 1611.

Although the ALJ concluded hypocalcemia could cause the symptoms Plaintiff alleged, the ALJ reasonably determined Plaintiff's specific symptoms were often not substantiated and her subjective complaints could not be credited because of the consistent pattern of drug-seeking behavior. *See* Section 3A, *supra*. Furthermore, the ALJ reasonably relied on evidence of Plaintiff's activities to conclude Plaintiff's symptoms of hypocalcemia and fibromyalgia do not prevent Plaintiff from performing the RFC. *See* Section 3B, *supra*.

Lastly, the ALJ gave significant weight to the March 2015 opinion by state agency consultant Norman Stanley, M.D., who reviewed Plaintiff's medical file and recommended an RFC no more restrictive than what was assessed by the ALJ. *See* AR 115, 116. Thus, while the record could support somewhat greater limitations than assessed in the RFC, substantial evidence supports the ALJ's RFC findings. Therefore, the ALJ did not err in determining Plaintiff's RFC.

**5. Whether the ALJ appropriately determined Plaintiff can perform other work existing in substantial numbers in the national economy.**

Lastly, Plaintiff contends the ALJ's step five determination was defective because the hypothetical presented to the VE did not include all the limitations in the RFC.

At the fifth and final stage of the disability determination process, the burden shifts to the Commissioner to prove that the Plaintiff can perform other work in the national economy, given her age, education, RFC, and past work experience. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). "[T]o support a finding that [one is] not disabled at this fifth step of the sequential evaluation process, [the Commissioner is] responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [one] can do, given [the] [RFC] and vocational factors." 20 C.F.R. § 404.1560(c)(2). "Without other reliable evidence of a claimant's ability to perform specific jobs, the Secretary must use a vocational expert to meet that burden. Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant." *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (citation omitted).

Here, the ALJ found plaintiff was disabled based on testimony from the VE that a person with plaintiff's age, education, experience, and most of the limitations in the RFC could perform the work of "mail clerk, Dictionary of Occupational Titles ["DOT"] 209.687-026[.]" *See* AR 36, 69. But as the Defendant concedes, plaintiff's RFC includes a limitation to frequent handling and fingering, and this limitation was not included in the hypothetical presented to the VE. AR 26-27, 68. However, even if the ALJ erred in failing to convey plaintiff's manipulative limitations to the VE, the ALJ's failure to do so was harmless.

Harmless error principles apply in the Social Security context. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). An error is harmless only if it is not prejudicial to the claimant or "inconsequential" to the ALJ's "ultimate nondisability determination." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006); *see Molina*, 674 F.3d at 1115. The determination as to whether an error is harmless requires a "case-specific application of judgment" by the

reviewing court, based on an examination of the record made "'without regard to errors' that do not affect the parties' 'substantial rights.'" *Molina*, 674 F.3d at 1118-19 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009)).

Here, although the manipulative limitations in plaintiff's RFC were not presented to the VE, this omission did not affect the ultimate disability determination because the ALJ found the Dictionary of Occupational Titles (the "DOT") indicates the job of mail clerk requires no more than frequent handling and reaching. AR 36 note 3. The ALJ's findings are consistent with the DOT entry for "mail clerk 209.687-026," which requires no more than frequent reaching, handling, and fingering. *See* DICOT 209.687-026 *Mail Clerk* (1991), available at 1991 WL 671813. Hence, even if the manipulative limitations in plaintiff's RFC had been presented to the VE, the ultimate disability determination would have been the same. Therefore, even if the ALJ erred in failing to present the manipulative limitations in the RFC to the VE, the ALJ's error was harmless.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner was based on substantial evidence. Therefore, the Commissioner's decision is hereby AFFIRMED. JUDGMENT should be for DEFENDANT and the case should be closed.

Dated this 3rd day of July, 2019.

Theresa L. Fricke
United States Magistrate Judge

OPINION AND ORDER TO AFFIRM THE
COMMISSIONER'S DECISION TO DENY DISABILITY
BENEFITS - 18